UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>    v.<br><br>HYPERBEARD, INC., a corporation, and<br><br>ALEXANDER KOZACHENKO and ANTONIO URIBE,<br>     individually and as officers of<br>     HyperBeard, Inc.,<br><br>                              Defendants. | Case No. 3:20-cv-3683<br><br>**COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION, AND OTHER EQUITABLE RELIEF** |

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.  Plaintiff brings this action under Sections 5(a)(1), 5(m)(1)(A), 13(b), 16(a)(1), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a)(1), 45(m)(1)(A), 53(b), 56(a)(1) and 57(b), and Sections 1303(c) and 1306(d) of the Children's Online Privacy Protection Act of 1998 ("COPPA"), 15 U.S.C. §§ 6502(c) and 6505(d), to obtain monetary civil penalties, a permanent injunction, and other equitable relief for Defendants' violations of Section 5 of the FTC Act and the Commission's Children's Online Privacy Protection Rule ("Rule" or "COPPA Rule"), 16 C.F.R. Part 312.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, and under 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 56(a).

3. Venue in the Northern District of California is proper under 15 U.S.C. § 53(b) and 28 U.S.C. §§ 1391(b)(1) and 1395(a).

## SECTION FIVE OF THE FTC ACT

4. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits unfair and deceptive acts or practices in or affecting commerce.

## THE CHILDREN'S ONLINE PRIVACY PROTECTION ACT RULE

5. Congress enacted COPPA in 1998 to protect the safety and privacy of children online by prohibiting the unauthorized or unnecessary collection of children's personal information online by operators of Internet Web sites and online services. COPPA directed the Commission to promulgate a rule implementing COPPA. The Commission promulgated the COPPA Rule on November 3, 1999, under Section 1303(b) of COPPA, 15 U.S.C. § 6502(b), and Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553. The Rule went into effect on April 21, 2000. The Commission promulgated revisions to the Rule that went into effect on July 1, 2013. Pursuant to Section 1303(c) of COPPA, 15 U.S.C. § 6502(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57(a)(d)(3), a violation of the Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

6. Among other things, the COPPA Rule applies to any operator of a commercial website or online service directed to children that collects, uses, and/or discloses personal information from children, and to any operator of a commercial website or online service that has

actual knowledge that it collects, uses, and/or discloses personal information from children.  The Rule requires an operator to meet specific requirements prior to collecting online, using, or disclosing personal information from children, including but not limited to:

    a.    Posting a privacy policy on its website or online service providing clear, understandable, and complete notice of its information practices, including what information the website operator collects from children online, how it uses such information, its disclosure practices for such information, and other specific disclosures set forth in the Rule;

    b.    Providing clear, understandable, and complete notice of its information practices, including specific disclosures, directly to parents;

    c.    Obtaining verifiable parental consent prior to collecting, using, and/or disclosing personal information from children;

    d.    Deleting personal information collected from children online, at a parent's request; and

    e.    Retaining personal information collected from children online only as long as is reasonably necessary to fulfill the purpose for which the information was collected.

**DEFINITIONS**

7. For purposes of this Complaint, the terms "child," "collects," "collection," "disclosure," "Internet," "obtaining verifiable parental consent," "online contact information," "operator," "parent," "personal information," and "Web site or online service directed to children," are defined as those terms are defined in Section 312.2 of the COPPA Rule, 16 C.F.R. § 312.2.

**DEFENDANTS**

8. Defendant HyperBeard, Inc. ("HyperBeard"), is a California corporation with its principal place of business at 5026 Brophy Drive, Fremont, California 94536.  HyperBeard transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, HyperBeard has advertised, marketed, and distributed mobile applications ("apps") to consumers throughout the United States.

9. Defendant Alexander Kozachenko is the Chief Executive Officer ("CEO") of HyperBeard.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts or practices of HyperBeard, including the acts or practices set forth in this Complaint.  Defendant Kozachenko, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

10. Defendant Antonio Uribe is the Co-Founder and Managing Director of HyperBeard.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts or practices of HyperBeard, including the acts or practices set forth in this Complaint.  Defendant Uribe, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**COMMERCE**

11. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' BUSINESS PRACTICES**

12. Since at least 2016, Defendants have offered a number of mobile apps for download from the Apple App Store and the Google Play Store (collectively the "App Stores"). At least some of these apps are directed to children, including Axolochi, BunnyBuns, Chichens, Clawbert, Clawberta, KleptoCats, KleptoCats 2, KleptoDogs, MonkeyNauts, and NomNoms (collectively "Kids Apps"). (*See* Exhibit A, copies of Kids Apps' initial screens.) The apps send and/or receive information over the Internet, and thus are online services pursuant to COPPA. All Kids Apps are free to download and play, but generate revenues through in-app advertising and in-app purchases.

13. Defendants are "operators" as defined by the Rule, 16 C.F.R. § 312.2.

14. Axolochi, which has been available since 2018, is an app in which users take care of and play with Axolochis, brightly colored animated axolotls, exotic amphibian animals popular with children. Once a user's Axolochi grows up and is released into the world, the user receives a new axolotl egg, which hatches and the activity starts again. The description of the app on the Defendants' website and the App Stores states: "Axolochis are axolotls, SUPER cute aquatic creatures from the mystical country of Mexico that you can help grow into hundreds of amazing shapes and colors! The babies are absolutely ADORABLE but they grow old so FAST!" (*See* Exhibit B).

15. BunnyBuns, which has been available since early 2019, is an app in which users bake pastries and play games with smiling animated bunnies. The description of the app on the Defendants' website and the App Stores states: "Welcome to BunnyBuns! A magical pastry shop where I use my MYSTICAL BUNNY BAKING POWERS to mix feelings with fillings to create the most delicious pastries EVER!" (*See* Exhibit C).

16. Chichens, which has been available since 2017, is an app in which users tap on colorful animated creatures called chichens, which mimic the appearance of baby chicks. Users can hatch chichen eggs by tapping them, and then wait for a surprise chichen variation to appear (*e.g.*, a pizza chichen, a double-headed chichen). The description of the app on the Defendants' website and the App Stores states: "Chichens are cute, silly little critters that go insane when you tap them and drop all sorts of fun things. Fill each world with chichens and unlock the next one. You never know what these silly chichens are going to do!" (*See* Exhibit D).

17. Clawbert, which has been available since in or around 2016, is an app similar to an arcade claw game in which users use a crane claw to catch surprise eggs, which later hatch into kid-friendly prizes such as baby animals and toys. Both the Clawbert character, which operates the crane, and the surprise eggs it catches are cartoon characters with smiley faces. The description of the app on the Defendants' website and the App Stores states: "Clawbert is a lonely claw. He only has two fingers. But he has a full heart! Help Clawbert find friends. Make Clawbert happy again! The Clawbert UFO catcher machine is great for children and adults alike. Collect the cutest, most adorable toy creatures from surprise eggs as you try to fill your collection." (*See* Exhibit E).

18. Clawberta, which has been available since early 2019, is a female variation of Clawbert, described above. Similar to Clawbert, Clawberta allows users to catch toy capsules with its claws, which later open to reveal surprise prizes. Users can also change Clawberta's hairstyles and customize the character's appearance. The description of the app on the Defendants' website states: "Discover amazing toy surprises with the raddest claw machine to ever enter the arcade . . . Clawberta! Unlock hundreds of the cutest toys from exciting places all around the world! Dress up Clawberta with trendy hairstyles and interesting puzzles . . ." The

App Stores' description is similarly kid-friendly: "Oh. My. Claw.  Did someone say MAKEOVER?!" and "Prepare yourself for cuteness OVERLOAD!"  (*See* Exhibit F).

19. KleptoCats, which has been available since 2016, is an app in which users send a cartoon cat out on a mission, and the cat returns with surprises that users collect in a virtual room.  Users can pat, groom, dress, accessorize, and feed their cats, which makes the cats go on more frequent missions and return with additional collectibles.  The in-game currencies are coins and gems, which users must earn or purchase in order to obtain additional cats.  Users can earn coins by playing simple in-app mini games or by watching advertisement videos.  The description of the app on the Defendants' website and the App Stores states:  "KleptoCats are cute.  But they have a dark side.  They can't stop stealing!  But then again . . . your room is kinda empty.  What a CAT-astrophe.  I guess your furry friend's frisky paws may be a perfect match to fill your room.  Send your cat away to gather items to fill your room with amazing treasures.  PAW-some!!!  You never know what KleptoCats will bring back next."  (*See* Exhibit G).

20. KleptoCats 2, which is a sequel to KleptoCats and has been available since 2018, similarly involves sending a cartoon cat on a mission, and then collecting the surprises the cat retrieves.  The description of the app on the Defendants' website and the App Stores states: "KleptoCats 2, the sequel to the viral phenomenon, KleptoCats, brings back all your favorite feline friends along with some fresh new kitties.  It's 2x more cute, 2x more fun, 2x more mysterious . . . and, yep you guessed it, 1337x pure PAW-someness!"  The website adds that "This game is PURRR-fect for kids, moms, mom's moms, senioritas [*sic*] and cool dudes alike."  (*See* Exhibit H).

21. KleptoDogs, which has been available since around 2018, is an app similar to KleptoCats but with canine characters instead of feline.  KleptoDogs allows users to send

COMPLAINT

animated dogs on adventures, and to collect objects the dogs retrieve.  The description of the app on the Defendants' website and the App Stores states:  "GemDog returns home from his adventures with the KleptoCats in order to lead other outrageously cute pups in their quest to fill rooms with the strangest things . . . Feed them, play with them and even dress them in the cutest clothes.  You'll have a blast hanging with these puppy pals!!!"  (*See* Exhibit I).

22. MonkeyNauts, which has been available since 2018, is an app in which users explore the galaxy and perform kid-friendly science experiments with animated monkey scientists, such as determining whether there are bananas in space.  Users can earn in-game currency, coins, and gems by playing games or watching advertising videos.  Users can use coins or gems to obtain additional monkeys.  The description of the app on the Defendants' website and the App Stores states:  "Historians agree that MONKEYS, not humans, single-handedly pioneered the global space program.  And now these adorable "Monkeynauts" are ready to blast off to NEW worlds to meet their extra-terrestrial, banana-eating brethren . . . Travel to new planets, get rewards, eat bananas and unlock strangely adorable new monkeys."  (*See* Exhibit J).

23. NomNoms, which has been available since early 2019, is an app in which users use a slingshot to launch cartoon characters across the screen to collect surprise eggs, which provide them with food or coins.  Once the player obtains an egg, the player must wait for it to hatch to reveal the surprise inside.  The description of the app in the App Stores and on the Defendants' website states:  "NomNoms are cute little monsters that just want to munch, or NOM, on yummy foods, called "NOMS"…which are stored in surprise eggs, a.k.a. 'NOM-tainers' . . . Confused by our misNOMers?!  LOL, great!"  (*See* Exhibit K).

COMPLAINT

24. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants have violated, are violating, or are about to violate laws enforced by the Commission.

## **DEFENDANTS' KIDS APPS ARE DIRECTED TO CHILDREN**

25. Pursuant to Section 312.2 of the Rule, the determination of whether an app is directed to children depends on factors such as the subject matter, visual content, language, and use of animated characters or child-oriented activities and incentives. An assessment of these factors demonstrates that the Defendants' Kids Apps are directed to children under the age of 13.

26. Defendants' Kids Apps contain brightly colored, animated characters including cats, dogs, bunnies, chicks, monkeys and other cartoon characters, which Defendants themselves have consistently described as "SUPER cute," "adorable," "silly," and with similar kid-friendly adjectives. (*See, e.g.*, Exhibits B - K).

27. The subject matters of the Defendants' Kids Apps are highly appealing to children. The apps' subject matters include collecting smiley cats, dogs, chicks, eggs, coins and gems, as well as baking with animated bunnies, catching smiley surprise eggs, shopping from a toy machine, caring for an animated baby axolotl, and conducting simple science experiments with baby monkey scientists. (*See, e.g.*, Exhibits J, G, I, B).

28. The language used to describe the Kids Apps in the App Stores and on the Defendants' website is simple, kid-friendly and would be highly appealing to a child under age 13. For example, "Chichens are cute, silly little critters that go insane when you tap them . . .," "KleptoCats are cute. But they have a dark side. They can't stop stealing! . . . What a CAT-astrophe!" (*See, e.g.*, Paragraph 16 and Paragraph 19).

COMPLAINT

29. Defendants' Kids Apps are very simple and easy to play—most involve simply tapping on a character and playing very easy in-app games.

30. HyperBeard itself notes on at least two occasions that its apps are recommended for children as well as adults. (*See* Paragraph 17 and Paragraph 20 (Clawbert and Klepto Cats 2 HyperBeard website descriptions)).

31. Defendants were aware that children were using the Kids Apps, and promoted the apps to a child audience. For example, from early 2017 through 2019, Defendants promoted apps on a kids entertainment website, *YayOMG!*. (*See* Exhibit L). Specifically, Defendants provided complimentary codes and in-game currency to *YayOMG!* in exchange for a series of Kids Apps reviews including for Axolochi, BunnyBuns, Chichens, Clawbert, Clawberta, KleptoCats 2, KleptoDogs, MonkeyNauts, and NomNoms. (*See* Exhibit M). The reviews focus on how "adorable," "fun," and "cute" the games are, and highly recommend the apps to the website's readers. HyperBeard then promoted the reviews through "retweets" and "likes" on the Company's Twitter page. (*See* Exhibit N). Several reviews include quotes from HyperBeard's developers related to character design and other kid-friendly topics. Additionally, *YayOMG!* interviewed Defendant Uribe, and published the interview on its site on April 25, 2017. In the interview, the interviewer mentions how "super adorable" the HyperBeard games are, and notes that *YayOMG!*'s readers are "mainly young girls." (*See* Exhibit L).

32. Defendants also promoted the KleptoCats app to a child audience through the 2018 publication of the book "*KleptoCats: It's Their World Now*!" with the children's publisher, Scholastic, Inc., which offers its books for sale in elementary schools, among other places. The book was written by a children's author, Daphne Pendergrass. On Amazon.com, for example, the book is categorized under "Children's Books." The book's suggested age range on the

Amazon.com listing is 7-10 years, while the recommended grade level is 2-5.  Several reviews mention that the books were purchased for children (*e.g.*, "my grandkid loves these cats," "my kid likes the KleptoCat game," and "my 8 year old loves the book.").  (*See* Exhibit O).

33. Defendants recently published a similar book related to the KleptoDogs app.  The book is titled "*KleptoDogs: It's Their Turn Now*!," was published by Scholastic, Inc., and is written by the same children's author who wrote the KleptoCats book, Daphne Pendergrass.  The book is similarly categorized under "Children's Books" on Amazon.com, and it is intended for ages 7-10 and grade levels 2-5.  The book has been available for pre-order since at least March 2019, and was published in September 2019.  (*See* Exhibit P).

34. Defendants also promoted the KleptoCats app to a child audience through the merchandizing and sale of plush stuffed animals in the shape of KleptoCats.  Several reviews on an online retail site, for example, mention that the toys were purchased for children (*e.g.*, "My daughter collects these . . .," and "My daughter was so excited she got the one she wanted!").  (*See* Exhibit Q).

35. HyperBeard also licensed the KleptoCats characters to several companies to create other KleptoCats-themed child-directed products including a *K'Nex* block construction set, calendars, posters, stickers, and bookmarks.  The products are available on various online retailers including Amazon.com, eBay, and HyperBeard's KleptoCats-specific website, KleptoCats.com.  (*See* Exhibit R).  The products feature bright colors, designs and decorations that appeal to children.  The reviews on an online retail site indicate that the items were purchased for children (*e.g.*, "My granddaughter loved it," "My 8 year old daughter got super excited because of the decal," and "Surprised my daughter with this.  She loves the KleptoCats

and loved this calendar."). The products display HyperBeard's logo, and several item descriptions note that the products are "officially licensed" KleptoCat merchandise.

36. Through the Kids Apps, Defendants allowed third-party advertising networks AdColony, AdMob, AppLovin, Facebook Audience Network, Fyber, IronSource, Kiip, TapCore, TapJoy, Vungle and UnityAds to collect personal information, in the form of persistent identifiers, in order to serve behavioral advertising (*i.e.*, targeted advertising on the apps based on users' activity over time and across sites). Until August 2019, after being contacted by FTC staff in this matter, Defendants did not inform these third-party advertising networks that any of the Kids Apps are directed to children, and did not instruct or contractually require the advertising networks to refrain from behavioral advertising. Defendants also failed to provide the required notices or obtain the required parental consent described in Paragraph 6.

## **VIOLATION OF THE CHILDREN'S ONLINE PRIVACY PROTECTION RULE**

### **Count I**

37. Defendants operate online services directed to children, including through the Kids Apps, which collect personal information from children under age 13.

38. As described in Paragraphs 25 through 36 above, Defendants collected (or caused to be collected on their behalf) personal information from children younger than age 13 in violation of the Rule. Defendants thus violated the Rule by:

a. Failing to provide notice on Defendants' online services of the information they collect, or that is collected on their behalf, online from children, how such information is used, and their disclosure practices, among other required content, in violation of Section 312.4(d) of the Rule, 16 C.F.R. § 312.4(d);

     b.     Failing to provide direct notice to parents of the information Defendants collect, or that is collected on Defendants' behalf, online from children, how such information is used, and their disclosure practices for such information, among other required content, in violation of Section 312.4(b) of the Rule, 16 C.F.R. § 312.4(b); and

     c.     Failing to obtain verifiable parental consent before any collection or use of personal information from children, in violation of Section 312.5(a)(1) of the Rule, 16 C.F.R. § 312.5(a)(1).

39.     Pursuant to Section 1303(c) of COPPA, 15 U.S.C. § 6502(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THIS COURT'S POWER TO GRANT RELIEF

40.     Defendants violated the Rule as described above with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

41.     Each collection, use, or disclosure of a child's personal information in which Defendants violated the Rule in one or more of the ways described above constitutes a separate violation for which Plaintiff seeks monetary civil penalties.

42.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74, sec. 701, 129 Stat. 599 (2015), and Section 1.98(d) of the FTC's Rules of Practice, 16 C.F.R. §

1.98(d), authorizes this Court to award monetary civil penalties of not more than $41,484 for each violation of the Rule after January 22, 2018.

43.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff United States of America, pursuant to 5(a)(1), 5(m)(1)(A), 13(b), 16(a) and 19 of the FTC Act, 15 U.S.C. §§ 45(a)(1), 45(m)(1)(A), 53(b), 56(a)(1) and 57(b) and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and the Rule by Defendants;

B.     Award Plaintiff monetary civil penalties from Defendants for each violation of the Rule alleged in this Complaint; and

C.     Award other and additional relief the Court may determine to be just and proper.

Respectfully submitted,

Dated: June 3, 2020

| FOR THE FEDERAL TRADE COMMISSION: | FOR PLAINTIFF THE UNITED STATES OF AMERICA: |
|---|---|
| MANEESHA MITHAL<br>Associate Director<br>Division of Privacy and Identity Protection | JOSEPH H. HUNT<br>Assistant Attorney General<br>Civil Division |
| MARK EICHORN<br>Assistant Director<br>Division of Privacy and Identity Protection | ETHAN P. DAVIS<br>Deputy Assistant Attorney General<br>Civil Division |
| GORANA NESKOVIC<br>Attorney<br>Division of Privacy and Identity Protection<br>Federal Trade Commission<br>600 Pennsylvania Avenue, N.W.<br>Mail Stop CC-8232<br>Washington, D.C. 20580<br>(202) 326-2282 | GUSTAV W. EYLER<br>Director<br>Consumer Protection Branch<br><br>ANDREW E. CLARK<br>Assistant Director<br>Consumer Protection Branch |
| PEDER MAGEE<br>Attorney<br>Division of Privacy and Identity Protection<br>Federal Trade Commission<br>600 Pennsylvania Avenue, N.W.<br>Mail Stop CC-8232<br>Washington, D.C. 20580<br>(202) 326-3538 | /s/ *Danielle Serbin*<br>DANIELLE SERBIN<br>Trial Attorney<br>Consumer Protection Branch<br>U.S. Department of Justice<br>P.O. Box 386<br>Washington, DC 20044-0386<br>Phone: (202) 514-8742<br>Fax: (202) 514-8742<br>Email: danielle.e.serbin@usdoj.gov<br>California SBN 294369 |